CARMEN CAROTHERS, )
)
     Plaintiff, )
)   Case No. 12 CV 6620
     v. )
)   Judge Joan H. Lefkow
OFFICE OF TRANSITIONAL )
ADMINISTRATOR, EARL DUNLAP, and the )
COUNTY OF COOK, )
)
     Defendants. )

## OPINION AND ORDER

Plaintiff Carmen Carothers filed a five-count second amended complaint against the
Office of the Transitional Administrator ("OTA"), Earl Dunlap, and Cook County (collectively
referred to as "defendants") alleging sex, race, and disability discrimination, and retaliation in
violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and
the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA").[1]  (Dkt. 21 ("Compl.").)
Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56 on all
claims.  (Dkts. 57, 59.)  For the reasons stated below, defendants' motion is granted.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any
material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.
56(a).  A genuine issue of material fact exists if "the evidence is such that a reasonable jury
could return a verdict for the nonmoving party."  *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242,
248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  To determine whether any genuine fact issue

---

[1] This court has jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. s 2000e-5(f)(3).  Venue is
proper under 28 U.S.C. § 1391(b).

exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c). In doing so, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott* v. *Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). The court may not weigh conflicting evidence or make credibility determinations. *Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011).

The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). If a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex*, 477 U.S. at 323–24.

## BACKGROUND[2]

The OTA is an agency of the federal government that oversees the day-to-day operations of the Cook County Juvenile Detention Center ("CCJDC"). *See Doe* v. *Cook Cnty.*, No. 99 C 3945, Dkt. No. 330 (August 14, 2007), modified June 22, 2010. The court appointed Earl Dunlap to serve as Transitional Administrator in charge of the transfer of the administration of

---

[2] Unless otherwise noted, the facts in the background section are taken from the parties' Local Rule 56.1 statements and are construed in the light most favorable to Carothers. The court will address many but not all of the factual allegations in the parties' submissions, as the court is "not bound to discuss in detail every single factual allegation put forth at the summary judgment stage." *Omnicare, Inc.* v. *UnitedHealth Grp., Inc.,* 629 F.3d 697, 704 (7th Cir. 2011) (citation omitted). In accordance with its regular practice, the court has considered the parties' objections to the statements of fact and includes in this background only those portions of the statements and responses that are appropriately supported and relevant to the resolution of this motion. Any facts that are not controverted as required by Rule 56.1 are deemed admitted.

the CCJDC from the executive branch of Cook County to the Office of the Chief Judge of the Circuit Court of Cook County. (Dkt. 58 ("Defs.' L.R. 56.1") ¶ 4.)

## I.     Carothers' Employment at the CCJDC

Carmen Carothers, an African-American woman, began working at the CCJDC in 2005. Carothers has a B.A. from the University of Kansas and an M.A. in Human Service Administration from Concordia University. She was hired as an Administrative Assistant 1/Hearing Officer. The position involved two sets of administrative duties: "compiling statistics, data inputting, and creating reports" and "serv[ing] as a hearing officer to adjudicate the detainees' grievances."[3] (Defs.' L.R. 56.1 ¶ 18.) She remained in that position throughout her employment at the CCJDC.

In 2008, Carothers was in an automobile accident, which resulted in injuries to her hands. In June 2009, Carothers' hands were re-injured during a detainee riot. She then went on a leave of absence from June 2009 to March 2010. Carothers asserts that, in addition to physical injuries, she suffered an anxiety disorder as a result of the June 2009 incident, which caused her particularized anxiety about working with juvenile detainees.

Diana Anderson, the Director of Human Resources at the relevant time, informed Carothers by letter on July 16, 2009 that the CCJDC would attempt to accommodate her hand injury and that she needed to make an appointment with the Cook County Department of Resources' Medical Division ("Medical Division") to receive clearance to return to work.[4] Anderson followed up in October 2009 with a letter notifying Carothers that she had received a

_____

[3] At the time, of the six people in this role, four primarily served as Hearing Officers and two performed mostly data compilation. Nonetheless, all shared the same job description. (Defs.' L.R. 56.1 ¶ 20.)

[4] This was in accordance with CCJDC policy that prohibits any employee from working with medical restrictions if those restrictions limit their ability to perform their job duties. (Defs.' L.R. 56.1 ¶ 58.)

statement from Carothers' personal physician clearing her to return to work but she still needed clearance from the Medical Division.

In December 2009, after learning of Carothers' anxiety, Anderson sent a letter informing Carothers that her position required interaction with detainees and suggested that she review job openings on the job search website CareerBuilder to see if there were open positions that would minimize such contact. There were no appropriate jobs listed. In January 2010, Anderson wrote to Carothers and suggested she contact the Cook County Pension Board to apply for disability benefits.

On March 15, 2010, Deputy Transitional Administrator Brenda Welch informed William Kern, the Deputy Executive Director, that Carothers would be returning to work. When she returned to work the next day, Carothers did not raise her anxiety issues with Kern, her supervisor. Kern provided Carothers with a copy of her job description, which Carothers signed, but Carothers noted on the signed copy that she was not a hearing officer. Although Carothers disputes that serving as a hearing officer was part of her actual duties, she did function as a hearing officer during her time at CCJDC: between March and October 2007, Carothers completed over 188 disciplinary due process hearings for detainees. (*Id.* Exh. 10.)

In October 2010, Carothers applied for an open position at the CCJDC for the role of Project Manager—Programs and Professional Services.[5] After a phone interview, she was asked to schedule a required test in connection with that position. Carothers never took the test. (*Id.* ¶ 55.)

Meanwhile, Kern directed Carothers to take the De-escalation and Physical Restraint Techniques Training to aid in her position as a hearing officer. Kern scheduled the training for

---

[5] Carothers also applied for a position entitled Quality Assurance Administrative Analyst 1 in December 2010, but was never interviewed for the position.

October 28 and 29, 2010. Carothers then requested those two days off for previously scheduled

doctors' appointments, which Kern denied in light of the scheduled trainings. Carothers then

submitted her request to the Deputy Executive Director Teresa Abreu, who approved the

vacation days. Kern rescheduled the trainings for December 22 and 27, 2010, and instructed

Carothers to observe three current hearing officers prior to December 31, 2010.

The parties disagree as to whether Carothers informed Kern at this point about her

anxiety about working with detainees. It is undisputed, however, that on December 22, 2010,

Carothers provided Kern with a letter from James M. Campbell, her counselor, who informed

Kern that "[d]ue to a recent traumatic incident that resulted in a high degree of anxiety, I [Mr.

Campbell] feel that it would be advisable to have [Carothers] avoid working with children at this

time." (*Id.* ¶ 28.) Anderson denied this accommodation. Carothers was instructed to continue

performing the duties outlined in the job description. Carothers proceeded to attend the PRT

training on December 22, 2010 but did not attend the De-escalation Training because she could

not locate it.[6] Kern sent a memo to the Government and Labor Relations Unit recommending

that Carothers be disciplined for her failure to attend the training. (*Id.* ¶ 32.)

On December 29, 2010, Carothers began to shadow other hearing officers per Kern's

instructions and, during one observation, she fainted and was taken to a hospital. Anderson sent

Carothers a memo regarding the fainting incident and instructed her that she could not return to

work until the CCJDC received medical clearance. Anderson told Carothers that she could

contact the county's workers' compensation unit. Anderson followed up with another letter on

January 4, 2011, which explained that Carothers' position required daily contact with detainees

_____

[6] Defendants note that the De-escalation Training took place in the same place as the PRT
training, which was the only room at the CCJDC where training is conducted and is located fifteen feet
from Carothers' office. (Defs.' L.R. 56.1 ¶ 31.)

as a primary responsibility of the position. Anderson instructed Carothers to provide a report by January 7, 2011 as to whether she could return to work given that job requirement.

Dr. Mankowski at the Cook County Human Resources' Medical Unit examined Carothers and provided a report that said Carothers could return to work as long as she had no contact with detainees. Anderson informed Carothers that, due to this restriction, she was incapable of performing her duties as Administrative Assistant 1/Hearing Officer. Anderson referred Carothers to the Cook County Pension Office to apply for temporary disability and to secure eligibility for an approved leave of absence. Anderson also suggested that Carothers either apply for another job or for Permanent Disability as a long term solution.

Carothers received word from the Cook County Risk Management Department[7] that she would not receive temporary disability payments. On February 8, 2011, Anderson informed Carothers that she had run out of unexcused leave and she needed to either return to work or submit the necessary paperwork for permanent disability. Anderson gave Carothers until February 16, 2011 to report back to work or until February 18, 2011 to submit the necessary paperwork.

Carothers confirmed she had submitted the paperwork on February 14, 2011. The paperwork, however, was incomplete and the Disability Department of the Cook County Pension Fund advised Carothers that she needed to submit her Attending Physician Statement and either the County Physician Statement or Certificate of Disability Status by May 9, 2011 or her application would not be reviewed. Carothers maintained that she had completed the paperwork. On April 8, 2011, Anderson advised Carothers that the Risk Management Office had denied her workers' compensation application and that her Pension Board application for disability was still

_____

[7] The Cook County Risk Management Department processes workers' compensation claims for the county.

incomplete.  Anderson asked Carothers to either return to work or complete her application by April 15, 2011 (or in the alternative, to schedule an appointment with the Medical Division of Cook County Human Resources Department by April 12, 2011).  On April 18, 2011, in light of the fact that Carothers had not yet complied with her directives, Anderson recommended that disciplinary proceedings commence.

In early May 2011, a disciplinary proceeding was held during which Carothers was represented by counsel.  During the hearing, it was determined that Carothers had more than ten unauthorized absences and that she did not follow Anderson's instructions.  The Hearing Officer recommended termination.  Carothers was terminated on May 6, 2011.

## II.      Alleged Comparators

Carothers identifies several individuals who she alleges received more favorable treatment.  In particular, Carothers alleges that some of these individuals were not required to interact with detainees.  Interaction with detainees, however, is an "essential aspect of every job at [the CCJDC]" and "even those employees who do not consistently interact with juveniles must still be capable of doing so in an emergency."  (Defs.' L.R. 56.1.¶ 59.)

The only exception to the near-universal requirement of interacting with detainees is the position of Support Clerk.  (*Id.* ¶¶ 60-63.)  Certain individuals are prohibited from contact with detainees because it has been established that they acted inappropriately toward detainees and there are court orders in place that prohibit the CCJDC from firing them.  (*Id.*)  Alleged comparators Kenny Davis and Vespar Young are both Support Clerks.  (*Id.* ¶ 64.)

John Albright was injured in the same riot that resulted in Carothers' hand injuries.  He was originally hired as a Youth Development Specialist.  He later started in a new position as a Professional Development Specialist in March 2011.  He obtained that position because of his

experience using cognitive behavior therapy.  In March 2013, Albright was promoted to Director of Quality Assurance.  Carothers does not deny that, in all three of these positions, Albright interacted with detainees on a regular basis.  (*Id.* ¶ 67.)

Donnie Mobley was a Supervisor of Quality Assurance from July 19, 2010 until November 2011.  Although he left his position temporarily in November 2011 due to illness, his absence was excused.  He returned to work in January 2012 when his health improved.  Throughout his employment at the CCJDC he interacted with detainees.  (*Id.* ¶ 69.)  Elizabeth Clemons, a Director of Quality Assurance hired in October 2010, was likewise never excused from contact with detainees.  (*Id.* ¶ 70.)

Latrcia Sykes, like Carothers, was an Administrative Assistant 1/Hearing Officer.  Although performing the functions of a hearing officer was part of her job description, at the relevant time she did not conduct detainee hearings.  (Dkt. 66 ("Defs.' L.R. 56.1 Resp.") ¶ 93.)  Unlike Carothers, Sykes did not have experience as a hearing officer.  (*Id.*; *see also* Defs.' L.R. 56.1 ¶ 22.)  She was, however, required to interact with detainees as were all employees of the CCJDC other than Support Clerks.  (Defs.' L.R. 56.1 ¶¶ 59-63.)

Carothers also alleges that some individuals were paid more for doing the same work, specifically Kern and Odaker.[8]  Deputy Executive Director William Kern is a licensed Clinical Social Worker.  He had thirty years of relevant experience when he was hired by the CCJDC.

---

[8] Carothers relies on her own belief, stating that "[s]he ended up doing jobs that fell under the job descriptions of William Kern, Tony Barone and Ronald Oldeker, all Caucasian males, however, each of the them made more money than she did." This claim, both on its face and because it lacks corroborating evidence, is insufficient to create a genuine issue of material fact as to whether Carothers and her comparators were doing equal work for unequal pay. *See Amadio v. Ford Motor Co.*, 238 F.3d 919, 927 (7th Cir. 2001) ("It is well-settled that speculation may not be used to manufacture a genuine issue of fact.")

Carothers makes a similar claim about Tony Barone, but there is no other information about him in the record upon which to base a comparison.  (Dkt. 65 ("Pl.'s L.R. 56.1") ¶ 101.)

Ronald Odaker[9] worked at the CCJDC from August 1973 to August 2010, when he retired. He was the Director of Resident Advocacy and Quality of Life.

## III.    Allegations of Discriminatory Conduct

According to Carothers, Earl Dunlap, the Transitional Administrator, stated that he would "take them to the woodshed" regarding unspecified African-American employees, and that he agreed with Malcolm X that "black people should have their own stuff." (Pl.'s L.R. 56.1 ¶ 96.) Carothers also alleges that Deputy Transitional Administrator Brenda Welch was sued in a previous job for retaliatory actions taken against African-American women. (*Id.* ¶ 97.)

## IV.    EEOC Charges

On July 22, 2009, Carothers filed a charge of disability discrimination with United States Equal Employment Opportunity Commission ("EEOC") . (Compl. at 5.) Several months later, on November 2, 2009, Carothers filed a follow-up charge alleging race, sex, and disability discrimination, and retaliation. (*Id.*) Brenda Welch was not aware of any EEOC charges and furthermore did not have a role in determining Carothers' role at the CCJDC. (Defs.' L.R. 56.1 ¶ 75.) William Kern and Ronald Odaker were also not aware of the filing. (*Id.* ¶¶ 76-77.)[10]

---

[9] Odaker is intermittently referred to as Oldaker in the parties' pleadings.

[10] Although Carothers does not admit these statements, she has no direct or circumstantial evidence indicating that any of the three was aware of her protected activity.

# ANALYSIS[11]

## I. ADA Claims

### A. Discrimination Claim

Carothers first argues that the CCJDC terminated her because of her anxiety about interacting with detainees. The ADA prohibits discrimination against a qualified individual with a disability on the basis of their disability. 42 U.S.C. § 12112(a). To establish discrimination based on disability, a plaintiff must show that (1) she is disabled within the meaning of the ADA, (2) she is qualified to perform the essential functions of her job, with or without reasonable accommodation, and (3) she suffered from an adverse employment action because of her disability. *Nese* v. *Julian Nordic Construction Co.*, 405 F.3d 638, 641 (7th Cir. 2005).

#### 1. Disabled under the ADA

While the ADA Amendment Act of 2008 ("ADAAA") expanded the scope of the ADA, it did not obviate the need to prove substantial impairment of a major life activity. A disability is defined as a physical or mental impairment that substantially limits one or more of the major life activities of that individual. 42 U.S.C. § 12102(1)(a). Defendants argue that Carothers' alleged disability—anxiety about interacting with detainees—does not substantially limit any major life activity.[12] A major life activity is defined by statute as activities such as "[c]aring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, reaching, lifting,

---

[11] In their reply brief, defendants request that the court grant summary judgment on the grounds that Carothers failed to comply with Federal Rule of Civil Procedure 56 and Local Rule 56.1 in her response. (Dkt. 66 at 1–3.) Although the argument is well taken in many respects, the court has done its best to winnow the facts to those supported by the record and declines to grant summary judgment on this basis. Plaintiff's counsel is advised to take this criticism to heart in future summary judgment filings.

[12] Carothers does not dispute that the CCJDC accommodated the physical injury that she sustained to her hands, so the court only considers the alleged mental disability of anxiety.

bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working." 29 C.F.R 1630.2(i).

Carothers does not specify which major life activity has been affected by her alleged anxiety disorder, but rather claims that "at least one major life activity" is limited. (Dkt. 64 at 5.) Though Carothers does not argue specifically that her ability to work is impaired, that is the most fitting category. The EEOC limits this category in its guidelines, noting that "[i]n most instances, an individual with a disability will be able to establish coverage by showing substantial limitation of a major life activity other than working." 29 C.F.R. Pt 1630 App. In cases where working is the only category in which the individual is disabled, that individual must show substantial limitation in "a class of jobs or broad range of jobs in various classes as compared to most people having comparable training, skills, and abilities," rather than a limitation in performing a specific job. 29 C.F.R. Pt. 1630, App. Here, Carothers cannot show that she was unable to work in a broad range of jobs; rather, her alleged disability was specific to her work at the CCJDC.

Likewise, Carothers cannot establish she was disabled due to an inability to interact with others. The Seventh Circuit, along with many other circuits, has avoided deciding what constitutes a disability resulting from an inability to interact with others. *See Jacques* v. *DiMarzio, Inc.,* 386 F.3d 192, 202 (2nd Cir. 2004) (citing *Emerson* v. *Northern States Power Co.,* 256 F.3d 506, 511 (7th Cir. 2001) (describing "interacting with others" in apparent *dicta* as one of many "activities that feed into the major life activities of learning and working")). In circuits that have recognized interacting with others as a major life activity, they contemplate an impairment that "severely limits the fundamental ability to communicate with others," for example, "to initiate contact with other people and respond to them, or to go among other

people." *Jacques,* 386 F.3d at 203. Here, Carothers anxiety is limited to interacting with juvenile detainees, she does not assert that she is incapable of interacting with others in general. In many ways, this case is similar to *Webb* v. *Clyde L. Choate Mental Health and Development Center*, 230 F.3d 991, 994 (7th Cir. 2000). There, the court affirmed summary judgment in favor of the employer after finding that the plaintiff's request to avoid contact with violent patients was unreasonable. The plaintiff's position required contact with the defendant hospital's violent patients, indeed, the court noted that "[m]any patients are housed at [defendant hospital] precisely because they exhibit unpredictable violent behavior—the very behavior [plaintiff] asserts he is unfit to counsel." *Id.* at 999.

Carothers has not demonstrated that her disability affects a major life activity under the ADAAA.

### 2.    Qualified Under the ADA

A qualified individual with a disability is a person who, with or without accommodation, can perform the essential functions of their position. 42 U.S.C. § 12111(8). An employer's judgment is a consideration in determining whether a particular activity is an essential function of the employee's position. 29 C.F.R. 1630.2(n)(3)(i). The employer's judgment is given deference in this determination. *DePaoli* v. *Abbott Labs.,* 140 F.3d 668, 674 (7th Cir. 1998). According to the CCJDC, working with the juvenile detainees is an essential function of virtually every job at the detention center. Indeed, the job description of Carothers' position accounts for such contact. (Defs.' L.R. 56.1 ¶ 18) (noting that Carothers' job description involved "serv[ing] as a hearing officer to adjudicate the detainees' grievances.") All employees are subject to at least occasional interaction with the detainees, save for a select category of employees who are either under investigation for or have been found guilty of inappropriate conduct with detainees

and were ordered to return to work by a court.  (*Id.* ¶¶ 59-63.)  Specifically, all but two of the individuals Carothers claims were excused from interacting with detainees in fact held positions that required interaction with detainees.  For example, she claims that John Albright was not required to interact with detainees, but Albright was at all times in positions that involved interactions with detainees.  (*Id.* ¶ 67.)  Albright was originally hired as a Youth Development Specialist.  He later started in a new position as a Professional Development Specialist in March 2011.  In March 2013, Albright was promoted to Director of Quality Assurance.  In all three of these positions, he interacted with detainees on a regular basis.  Elizabeth Clemons, a Director of Quality Assurance hired in October 2010, was likewise never excused from contact with detainees.  (*Id.* ¶ 70.)  Donnie Mobley, a Supervisor of Quality Assurance, was required to interact with detainees.[13]  (*Id.* ¶ 69.)  Latrcia Sykes, like Carothers, was an Administrative Assistant 1/Hearing Officer, and she was required to interact with detainees.[14]  (Defs.' L.R. 56.1 Resp. ¶ 93.)

Two individuals cited by Carothers, Kenny Davis and Vespar Young, were in fact banned from working with detainees.  (Defs.' L.R. 56.1 ¶ 64.)  Both are in the position of "Support Clerk," which means that they are not permitted to come into contact with detainees because it has been established that they acted inappropriately toward detainees.  (*Id.*)  Carothers does not allege that she qualifies for the position of Support Clerk.  She also does not suggest how her job

---

[13] Carothers also cites Donnie Mobley as an individual who was terminated for excessive absenteeism and reinstated.  Mobley was not terminated for excessive absenteeism, but rather was on an approved leave of absence and returned to work when his medical condition was resolved.  (Defs.' L.R. 56.1 ¶¶ 68, 69.)

[14] In Carothers' declaration she notes that she "did not see Ms. Sykes performing any hearings or having access to the residents."  (Pl. Ex. C.)  That statement does not suffice to establish that Ms. Sykes, like all CCJDC employees, was not required to be able to interact with detainees when necessary. *See Chiaramonte* v. *Fashion Bed Group, Inc.*, 129 F.3d 391, 401 (7th Cir. 1997) (a "[p]laintiff's own subjective belief does not create a genuine issue of material fact.")

could be performed without any contact with detainees, because even if she were not required to serve as a hearing officer, she would still be required to interact with detainees in the event of an emergency.

Because defendants have demonstrated that there is no genuine dispute that interacting with detainees is an essential function of Carothers' job, and because an employer is not required to change the essential functions of a job to accommodate an employee, *Emerson* v. *Northern States Power Co.*, 256 F.3d 506, 514 (7th Cir. 2001), Carothers has not established a *prima facie* case of discrimination.

Summary judgment is appropriate on Carothers' ADA claims because she was not substantially limited in a major life activity, and because she could not perform one of the essential functions of her position.

### B.      Failure to Accommodate Claim

Carothers also claims that the CCJDC failed to accommodate her disability. This claim requires a plaintiff to demonstrate that (1) she is a qualified individual with a disability, (2) her employer was aware of the disability, and (3) her employer failed to reasonably accommodate that disability. *Ekstrand* v. *School District of Somerset*, 583 F.3d 972, 975 (7th Cir. 2009). For the reasons discussed above (*see supra* Part I (A)(1) & (2)), Carothers has not met the first prong of this test, because she is not disabled within the meaning of the AAADA and she is not qualified. Because she cannot satisfy the first prong of the test, her failure to accommodate claim cannot survive defendants' summary judgment motion.

## II.      Race and Sex Discrimination

Carothers also asserts that her termination violated Title VII because it was based on her female gender and race. To survive summary judgment on a Title VII claim for gender or race

discrimination, a plaintiff may proceed under the direct or indirect method of proof. *Winsley* v. *Cook Cnty.*, 563 F.3d 598, 604 (7th Cir. 2009). To proceed under the direct method of proof, a plaintiff may present direct evidence of discrimination or circumstantial evidence sufficient to establish a "convincing mosaic' . . . that could permit a reasonable jury to conclude that the employer acted with discriminatory intent." *Brewer* v. *Bd. Of Trs. Of Univ. of Ill.*, 479 F.3d 908, 915 (7th Cir. 2007).

Carothers attempts to prove racial bias by Dunlap's alleged statement that he "would take them to the woodshed." (Pl.'s L.R. 56.1 ¶ 96.) She also claims that Dunlap stated that he agreed with Malcolm X that "black people should have their own stuff." (*Id.*) The phrase "take to the woodshed" is a widely used idiom that does not have racist overtones.[15] The Malcolm X statement could have conveyed that "black people" were "other" to the group as a whole. Nonetheless, that statement, if accepted as having been made, would not be sufficient to go to the jury as demonstrative of racial bias.

Carothers also offers no evidence to support her presumably hearsay allegation that Welch had been sued prior to her employment at the CCJDC for retaliatory actions taken against African-American women. (*Id.* ¶ 97.) Furthermore, Carothers does not support her contention that Welch participated in her termination. Because Carothers has not shown any direct or circumstantial evidence demonstrating discriminatory intent, the court will turn to the indirect method.

The indirect method of proof has three steps. First, the plaintiff must establish a *prima facie* case of discrimination by presenting evidence that (1) she is a member of a protected class, (2) her job performance was meeting her employer's legitimate expectations, (3) she was

---

[15] WORDCRAFT DICTIONARY defines "take to the woodshed" as "to 'grill' someone brutally, in private[.]" *See* http://wordcraft.infopop.cc/dictionary/part11.htm (visited on March 30, 2015).

subjected to a materially adverse employment decision,[16] and (4) her employer treated similarly situated employees outside of the protected class more favorably. *O'Regan* v. *Arbitration Forums, Inc.,* 246 F.3d 975, 983 (7th Cir. 2001); *see also McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 688 (1973). If the plaintiff establishes a *prima facie* case, the defendant must proffer a legitimate, nondiscriminatory reason for the adverse employment action. *Goodwin* v. *Bd. of Trs. of Univ. of Ill.*, 442 F.3d 611, 617 (7th Cir. 2008); *Paluck* v. *Gooding Rubber Co.*, 221 F.3d 1003, 1012 (7th Cir. 2000). Then, the plaintiff must rebut the nondiscriminatory reason "by presenting evidence that could enable the trier of fact to find that [the] reason is merely pretext for discrimination." *Goodwin*, 442 F.3d at 618–19; *see also O'Regan*, 246 F.3d at 983. Here, defendants concede that Carothers satisfies the first and third prongs of establishing a *prima facie* case but contend that Carothers has not established the second and fourth prongs, or that alternatively, Carothers has not shown pretext.

### A.    Job Performance

Defendants have established that interaction with detainees is an essential part of Carothers' job description. Diana Anderson, the Director of Human Resources, repeatedly informed Carothers by letter that her position as Administrative Assistant 1/Hearing Officer required interaction with detainees. Indeed, virtually all positions at the CCJDC require interaction with detainees. Upon her return to work after her leave of absence, Carothers' supervisor Kern provided her with a written job description, which Carothers signed, indicating that her position (Administrative Assistant 1/Hearing Officer) involves "compiling statistics, data

---

[16] Carothers raises other adverse employment actions, but only sufficiently establishes termination as an adverse employment action.

inputting, and creating reports" as well as "serv[ing] as a hearing officer to adjudicate the detainees' grievances."[17]  (Defs.' L.R. 56.1 ¶ 18.)

Carothers failed to attend a training required by her supervisor, which resulted in her supervisor recommending disciplinary action.  (*Id.* ¶ 32.)  Anderson also repeatedly advised Carothers to apply for disability and/or workers' compensation, and asked her to establish eligibility for an approved leave of absence.  Despite these instructions, Carothers failed to properly complete her paperwork in the time frame established by Anderson, and exceeded the allowed number of unexcused absences.

In light of the undisputed facts that Carothers was unable to comply with the requirements of her position, failed to follow directions from both her supervisor and the Director of Human Resources, and exceeded the allowed number of unexcused absences, defendants have demonstrated that no reasonable jury could find that Carothers satisfied her employers' legitimate expectations of job performance.

### B.     Similarly Situated Individuals

Carothers also fails to make out a *prima facie* case for race or sex discrimination because she has not identified a similarly situated individual who received more favorable treatment.  To establish a similarly situated individual, a plaintiff must normally show that the plaintiff and comparator employee dealt with the same supervisor, were subject to the same standards, and engaged in similar conduct without such differentiating circumstances as would distinguish their employer's treatment of them.  *Humphries* v. *CBOCS West, Inc.,* 474 F.3d 387, 404-05 (7th Cir.

---

[17]  Carothers maintains that she was not a hearing officer, but defendants show that between March and October 2007, Carothers completed over 188 disciplinary due process hearings for detainees. (Defs.' L.R. 56.1 Exhibit 10.)

2007).  The record does not support Carothers' allegations of similarly situated individuals receiving more favorable treatment.

Two individuals she cites as receiving more favorable treatment are Kern and Odaker. Both men were highly experienced and were hired for different, more senior positions.  Kern is a licensed Clinical Social Worker who had thirty years of relevant experience.  Odaker had worked at the CCJDC for more than thirty years.  He was the Director of Resident Advocacy and Quality of Life.  Neither Kern nor Odaker satisfy the requirements for a similarly situated individual. *Humphries,* 474 F.3d at 404-05.  They were not subject to the same standards, and did not deal with the same supervisor (indeed, Kern was Carothers' supervisor).  Carothers was hired as an Administrative Assistant 1/Hearing Officer.  She remained in that position throughout her employment at the CCJDC.

Because Carothers has not demonstrated that her performance was meeting her employer's legitimate expectations and has not identified a similarly situated individual who received more favorable treatment, she has failed to establish a *prima facie* case for discrimination.[18]  *See Stone* v. *Whitman*, No. 02 C 2877, 2003WL 21697370, at *4 (N.D. Ill. July 22, 2003).  Summary judgment is therefore appropriate on her race and sex discrimination claims.

## III.    Retaliation

Finally, Carothers alleges that employees of the CCJDC retaliated against her for filing a charge with the EEOC in 2009 alleging racial and gender discrimination.  Title VII prohibits an

---

[18] Furthermore, the record supports defendants' claim that Carothers was terminated for excessive unexcused absence and failure to follow the directions of the Human Resources Director.  The record is devoid of any evidence that defendants' explanation for Carothers' termination is dishonest or pretextual. Indeed, Carothers does not advance any argument to that effect.  *See Faas* v. *Sears, Roebuck & Co.,* 532 F.3d 633, 642 (7th Cir. 2008) (explaining that pretext in an employment discrimination case is a dishonest explanation, lie or phony excuse.)

employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a); *Brown* v. *Ill. Dep't of Natural Resources*, 499 F.3d 675, 684 (7th Cir. 2007).

Carothers can survive summary judgment under the indirect or direct methods of proof. *Tomanovich* v. *City of Indianapolis,* 457 F.3d 656, 662 (7th Cir. 2006) (citations omitted); *Majors* v. *General Elec. Co.,* 714 F.3d 527, 537 (7th Cir. 2013). The direct method requires a plaintiff to establish with direct or circumstantial evidence (1) that she engaged in statutorily protected conduct, (2) that she was subjected to an adverse employment action, and (3) that there was a causal link between the protected activity and the employment action. *Hobgood* v. *Ill. Gaming Bd.*, 731 F.3d 635, 642 (7th Cir. 2013). The parties do not dispute that Carothers engaged in protected conduct[19] or that Carothers's termination constituted an adverse employment action. Only the third element is at issue.

To establish the requisite causal link between the protected activity and the employment action, a plaintiff must prove that the protected activity was the "but for" cause of the action. *University of Texas Southwestern Medical Center* v. *Nassar,* — U.S. —, 133 S.Ct. 2517, 186 L. Ed. 2d 503 (2013). Carothers alleges that she was harassed as a result of her EEOC complaint by Welch, Kern and Odaker, none of whom was aware of her filing the complaint. (Defs.' L.R. 56.1 ¶¶ 75-77.) Welch was not involved in any employment decisions about Carothers. (*Id.* ¶ 75.) Carothers also argues that Anderson's refusal to allow her to return to work was

---

[19] In addition to filing the EEOC charge, Carothers notes that she reported improper conduct to the Investigator General's Office (Pl.'s L.R. 56.1 ¶ 104), and that she reported improper destruction of files (although she does not say to whom) (Pl.'s L.R. 56.1 ¶¶ 105, 107.) The court agrees that Carothers engaged in statutorily protected conduct.

retaliatory, but the record supports Anderson's claim that Carothers was not allowed to work because her injured hand prevented her from doing so. (*Id.* ¶ 8.) She was permitted to return to work after receiving medical clearance. (*Id.*) A reasonable jury could not infer that there was a causal link between any of her protected activities and her termination, or any other adverse employment action. As such, plaintiff is unable to establish a *prima facie* case under the direct method of proof.

Alternatively, under the indirect burden-shifting method, a plaintiff must show that she (1) engaged in statutorily protected activity; (2) was meeting her employer's legitimate employment expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees who did not engage in protected activity. *See Amrhein* v. *Health Care Serv. Corp.*, 546 F.3d 854, 859 (7th Cir. 2008). If the plaintiff makes out a *prima facie* case, the burden shifts to the defendant to show that a non-retaliatory reason for its actions exists. *Id.* The burden then shifts back to the plaintiff to show that the proffered reason is pretextual. *Id.* at 859–60. Defendants argue that Carothers cannot show either the second or the fourth prong. As discussed above, (*see supra* Part II (A) & (B)), the court agrees.[20]

Because Carothers has not shown that there is a genuine issue of material fact for trial, summary judgment must be granted with respect to her retaliation claim.

---

[20] Furthermore, Carothers has not presented evidence that the stated reasons for her termination (excessive absenteeism and failure to follow directives from superiors) were false or pretextual.

**CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment (dkts. 57, 59) is granted.  The case is terminated.

Date:   March 30, 2015

_____
U.S. District Judge Joan H. Lefkow